No. 14711

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

---

ROBERT E. WYNIA and WINONA C. WYNIA,

                Plaintiffs and Appellants,

-vs-

THE CITY OF GREAT FALLS, AND THE SCHOOL
DISTRICT #1 OF CASCADE COUNTY,

                Respondents and Defendants.

---

Appeal from: District Court of the Eighth Judicial District,
          Honorable Joel G. Roth, Judge presiding.

Counsel of Record:

    For Appellants:

        Jardine, Stephenson, Blewett and Weaver, Great Falls, Montana
        Jack L. Lewis argued, Great Falls, Montana

    For Respondents:

        J. Fred Bourdeau, County Attorney, Great Falls, Montana
        Carroll C. Blend argued, Deputy County Attorney, Great Falls, Montana
        David V. Gliko argued, City Attorney, Great Falls, Montana

---

                Submitted: June 7, 1979

                  Decided: SEP - 5 1979

Filed:        1979

*Thomas J. Kearney*
              Clerk

Mr. Justice Daniel J. Shea delivered the Opinion of the Court.

This appeal is brought by Robert and Winona Wynia from an order of the District Court, Cascade County, dismissing their action for declaratory judgment against the City of Great Falls and School District Number One of Cascade County. The Wynias had sought a declaration that the City's act of closing and barricading a street and alley which adjoined their residential lot was illegal. In the alternative, they had sought a declaration that if the street and alley had been legally closed, the City nonetheless was illegally restricting their use and enjoyment of the private legal interests which they retained in the roadway which their property abutted.

Plaintiffs own two adjoining residential lots on the northwest corner of the block in Great Falls. The lots are bounded on the north by Second Avenue South, on the west by 20th Street South, and on the south by Third Alley South. Great Falls High School is located just west of plaintiffs' property, across 20th Street South.

In October and November 1976, the School District circulated petitions which requested the City to close four intersections leading into a two block segment of 20th Street South. The affected segments of 20th Street South, Third Alley South, and Fourth Alley South are indicated on the diagram:



-2-

The effect of the closures is to create a cul-de-sac of the two block sections of 20th Street South on the east of Great Falls High School. All of the lot owners along both sides of the affected two blocks of 20th Street South, with the exception of plaintiffs, signed the petitions. Of the nine lot owners whose property abuts on Third Alley South, seven, excluding the plaintiffs signed the petitions.

The petitions which were presented to the plaintiffs and to the other lot owners on their block and along the two block section of 20th Street South did not mention the closure of the entire alley between 20th and 21st Street, or of the entire two blocks between Second Avenue South and Fourth Avenue South. Instead, the petitions referred to the closure of 22-1/2 foot "segments" of the street and alleys:

> "We, the undersigned adjoining property owners hereby petition the City Commission of the City of Great Falls to close those segments of 20th Street South, 3rd Alley South, and 4th Alley South described hereinbelow:
>
> "'a segment of 20th Street South which is bounded on the south by the south right-of-way line of 2nd Avenue South, and bounded on the north by a line which is parallel to and 22-1/2 feet north of the south right-of-way line of 2nd Avenue South; and, segments of 3rd Alley South and 4th Alley South which are bounded on the west by a line which is 22-1/2 feet west of the east right-of-way line of 20th Street South, and bounded on the east by the east right-of-way line of 20th Street South.'
>
> "We further petition the City Commission of the City of Great Falls to take all measures necessary to make effective the revision of traffic in the vicinity of Great Falls High School, with the understanding that such measures will be implemented on a trial basis until a final determination has been made by the City Commission that the overall effect of the revision of traffic has been beneficial."

On February 22, 1977, the City Commission adopted Resolution No. 6905, stating its intent to close the segments noted in the petition and provided for notice of publication in the Great Falls Tribune, a newspaper of general circulation in the affected

-3-

area. On March 15, 1977, the Commission passed Resolution No. 6920, providing for a closure of the 22-1/2 foot segments of 20th Street South and Third and Fourth Alleys South on a temporary basis. The Resolution contained a preamble which recited that the City Manager had caused notice of Resolution No. 6905 to be published in accordance with section 7-14-4114, MCA, on March 1, 1977.

On December 20, 1977, the City Commission passed Resolution No. 7035 providing for the permanent closure of two segments of 20th Street South, at the intersections of Second and Fourth Avenues South and one segment each of Third and Fourth Alleys South where they joined 20th Street South.

In the complaint filed on June 2, 1978, the plaintiffs sought a declaration that the percentage of owners whose lots abutted to the northernmost 22-1/2 foot segment of 20th Street South and the 22-1/2 foot segment of Third Alley South was insufficient to give the City authority to close those segments. Plaintiffs also sought, on that basis, to have Resolution Nos. 6905, 6920, and 7035, declared invalid, and the closure of the segments of 20th Street South and Third Alley South adjoining their property, declared illegal and void. The complaint sought a removal and permanent injunction against further placement of barricades on the 22-1/2 foot segments of 20th Street South and Third Alley South which their lots abutted. Finally, in the event the District Court held the closures valid, the plaintiffs sought a declaration that upon the closure of the segments they became owners of the half of the closed segments nearest their lot and were entitled to unencumbered use and ownership of that land.

On December 19, 1978, the District Court denied all relief sought by plaintiffs and granted the defendants' motion for summary judgment and dismissal of the complaint.

-4-

The principal issues presented for this Court's determination are whether the City of Great Falls followed the proper statutory procedures for closure of the segments of 20th Street South and Third Alley South abutting on plaintiffs' lots; and alternatively, if the City did properly close the segments of street and alley, does the closure effect a reversion of half of each of those segments to plaintiffs?

The plaintiffs' first issue is broken down into four categories. They contend first that the petitions requesting closure of the two segments of street and alley abutting on their property did not contain the required percentage of signatures from lot owners on the segments to be closed. Plaintiffs maintain that the City could not close the 22-1/2 foot segments of 20th Street South and of Third Alley South until it was presented with a petition signed by 75 percent of the lot owners whose property abutted those segments to be closed. They contend the City was without authority to consider the signatures of those lot owners who did not live on the portions of 20th Street South and Third Alley South which were not closed by the terms of the Resolutions.

Plaintiffs argue that the proper determination of the required percentage of signatures must be made in reference to those lots which abut on the segments to be closed. When that approach is followed, they point out, the only lot owners whose land abuts on the closed segment of 20th Street South are themselves and the School District. Similarly, the only lot owners whose property abuts on the closed segment of Third Alley South are themselves and their across-alley neighbors, the Skinners. In each case, then, the percentage of lot owners

-5-

whose lots abut on the closed segments who signed the petition was 50 percent, not 75 percent as required by statute.

Second, plaintiffs contend that the final resolution of the City Commission (No. 7035) was void because the petitions had requested only a temporary closure, not a permanent closure of the street and alley segments.

Third, plaintiffs argue that the closure is void because the City Commission did not give notice as required by section 7-3-4448, MCA, and that notice by publication was insufficient.

Fourth, plaintiffs claim that the ordinance of closure is void because it fails to preserve their private right-of-way and easement as required by section 7-3-4448, MCA.

Section 7-14-4115, MCA, provides for the discontinuance of streets and alleys. A series of amendments between 1887 and 1945 however, have left the statute with three different terms to describe the action which a city might take:

> "The council, or county commissioners if the town be unincorporated, may <u>discontinue</u> a street or alley, or any part thereof, in a city or town or unincorporated town or townsites, upon the petition in writing of all owners of lots on the streets or alleys, if it can be done without detriment to the public interest; provided that where the street or alley is to be <u>closed</u> for school purposes, a petition signed by seventy-five per cent (75%) of the lot owners on the whole street or alley to be closed, will be required; provided further that <u>such vacation</u> shall not affect the right of any public <u>utility to</u> continue to maintain its plant and equipment in any such streets or alleys." (Emphasis added.)

That the City in this case is acting "for school purposes" is not challenged. The plaintiffs' contention is only that the percentage of signatures obtained on the petition was inadequate because only those signatures of lot owners on the segments which were to be closed can be considered.

-6-

The difference between plaintiffs' and the City's position stems from a differing perception of the effect of the closure of the various 22-1/2 foot segments. The plaintiffs point to the literal language of the three City Commission Resolutions which refer to the closure of 22-1/2 foot "segments" of the roadways. By pointing to the total _effect_ of the "segment" closures, however, the City must take the position that the three resolutions were intended to have a broader impact than they show on their face. In essence, the _entire_ two blocks of 20th Street South were "closed" to through traffic by the City's action, and _not_ just four 22-1/2 foot segments of 20th Street South and Third and Fourth Alleys South.

Clearly, the entire two blocks were directly affected by the City's action. Plaintiffs contend that the City cannot argue concerning the total effect of the small closures, however, for to do so would modify or contradict the specific terms of the closure resolutions.

It is true that as a general rule public records must speak for themselves. Evidence offered to contradict an official record is therefore inadmissible. See Eastman v. School Dist. No. 1 (1947), 120 Mont. 63, 72-73, 180 P.2d 472, 476. Buell v. City of Bremerton (1972), 80 Wash.2d 518, 495 P.2d 1358, 1362. This rule does not extend so far as to prevent the drawing of a reasonable inference concerning the purpose of the proposed ordinance. "In construing a municipal ordinance, the courts will look to the ordinance as a whole to ascertain the intention of the lawmaking body and the purpose sought to be accomplished by the legislation." 1 Antieau Municipal Corporation Law §4.43 at 4-82 (1975). If possible, an attempt must be made to produce a harmonious whole from each and every part of a statute. City of Portland v. Kirk (Or.App. 1974), 518 P.2d 665, 666-67.

-7-

In this case a review of Resolution No. 7035 by itself shows that the City Commission contemplated the simultaneous closure of four 22-1/2 foot segments of street and alley. Considered as a whole, the intent to create a cul-de-sac is obvious. The Commission was not so much concerned with the 22-1/2 foot segments themselves as with the two blocks of street between the northernmost and southernmost segments.

The petition and resolutions do speak only of the closure of 22-1/2 foot segments, and section 7-14-4115, MCA, most naturally interpreted refers to the lot owners whose land is on the street actually to be closed. The statute does not speak in terms of those effected by the closure. Nor do the words "(75%) of the lot owners on the whole street or alley to be closed" support the City's argument that the statute is directed at those directly affected. In the first portion of the statute, the language refers to "any part" of a street or alley. Thus, if a part of a street is to be closed, the natural meaning of the statute is that the lot owners whose lots adjoin that whole part must be considered within the 75 percent.

The problem, then, is that while the City intended to prevent through traffic along two blocks of 20th Street South, it officially acted to "close" only 45 feet of the street itself. In effect, the entire two blocks were "closed" in one sense. The general public can no longer utilize 20th Street South to get from Fourth Avenue South to Second Avenue South. Similarly, lot owners along 20th Street South have restricted access to their property. Whatever character 20th Street South may now have, it is no longer a through roadway since it has been "closed" to that specific purpose.

-8-

Thus, the City Commission resolution, viewed in completeness, "closed" not just several 22-1/2 foot segments of street and alley, but also "closed" two blocks of 20th Street South. The petitions and resolutions are not completely descriptive of their effect. But their effect is surely the closure of two blocks of 20th Street South, and the imposition of similarly limited access to the two alleys between 20th and 21st Streets South.

Following this conclusion, then, all the lot owners along the affected two blocks of 20th Street South and along the affected two alleys were "lot owners on the whole street or alley to be closed". It was this entire group of lot owners which was relevant to the determination of the 75 percent requirement, despite the inartful drafting of the petitions and resolutions.

Plaintiffs argue that the City Commission lacked authority to adopt Resolution No. 7035 permanently closing the street and alley adjoining their lots, because the petitions which were presented to the Commission requested only temporary closure. It is true that the second paragraph of the petition contains the words "with the understanding that such measures will be implemented on a trial basis." That paragraph, however, continues, "until a final determination has been made by the City Commission that the overall effect of the revision of traffic has been beneficial."

By its wording, the petition appears to have intended that the City Commission have some form of continuing power after the trial basis closures were implemented, otherwise the phrase that begins "until a final determination" would have no meaning. Although the petition does not say what

-9-

that continuing power is, a fair inference is that the City would have the authority, following a trial period of closure, to permanently close the street and alleys. In fact, this appears to be precisely what the City did, for Resolution No. 6920, providing for temporary closure, was enacted in March 1977, while the final permanent closure resolution No. 7035, was not adopted until December 1977.

In a written interrogatory addressed to the City, plaintiffs asked, among other things, under what authority the City Commission had the right to declare the street and alley closures. The City answered:

> "Known at present but not limited to: Section 11-2801 R.C.M. 1947, Section 11-3308 R.C.M. 1947, Section 11-3208 R.C.M. 1947, Section 11-3201 R.C.M. 1947."

By this answer, plaintiffs contend that the City's expression of reliance upon section 7-3-4447(2), MCA, binds the City to follow its mandate. The section provides:

> "Improvement and vacation of streets and highways. When it deems it necessary, the commission may cause any street, alley, or public highway to be opened, straightened, altered, diverted, narrowed, widened, or vacated."

Plaintiffs correctly point out that if the City relies upon this statute, however, it must also follow the requirements of section 7-3-4448, dealing with vacation and name changes of streets. Section 7-3-4448, requires the city commission first to pass a resolution of intent to vacate the street and then requires the city manager to "cause notice of such resolution to be served in the manner that service of summons is required to be made in civil actions upon all persons whose property abuts upon the portion of the street affected . . ." It is

-10-

conceded that the City did not give such notice to plaintiffs but relied instead upon the notice by publication provision of section 7-14-4114(3), MCA. A single newspaper notice appeared on March 1, 1977 in the Great Falls Tribune and no personal service of the resolution of intent was ever attempted.

There is no doubt that the notice by publication on March 1, amply complied with the requirement of section 7-14-4114(3), MCA. The question then is whether the City was bound by sections 7-3-4447(2) and 7-3-4448. The plaintiffs' argument that the City is bound by these sections takes two directions. First, the plaintiffs argue that the City's reliance upon section 7-3-4447(2), MCA, in its answer to their interrogatory binds it to follow the section. The City's response to the interrogatory question, however, appears to be academic rather than an attempt to invoke its authority. It is clear from the resolution of March 15, 1977 (No. 6920) that the City had proceeded under section 7-14-4114(3), MCA. The City's brief on this appeal reiterates this conclusion. There seems no basis for holding the City to the notice requirements of Title 7, Chapter 11, Part 44, MCA, (formerly Title 11, Chapter 33, R.C.M. 1947) simply because a reference was made to that chapter in response to an interrogatory filed after the City's action was already complete.

A more serious question, however, is whether the City can elect to proceed under section 7-14-4115, MCA, and ignore the requirements of Chapter 11 when it closes a street. Plaintiffs argue that the words "vacate" and "close" are synonymous. Thus, they contend, that the City cannot avoid the requirements of sections 7-3-4447(2), MCA, and 7-3-4448, MCA, simply by referring to the action as a "closure" rather than a "vacation".

In State ex rel. Smart v. City of Big Timber (1974), 165 Mont. 332, 335, 528 P.2d 688, 692, this Court noted that section 7-14-4114 is "the amalgam of the intent of a number of legislatures." The Court continued:

-11-

"This is important when this single statute purports to deal with the 'discontinuance', 'closing', and 'vacation' of streets. It appears that the terms were thought of by the draftsmen as being interchangeable." 165 Mont. at 335, 528 P.2d at 692.

Smart, however, involved neither discontinuance, closing, nor vacation of a street, but only an alteration or improvement. 165 Mont. at 335, 528 P.2d at 692. Thus, there was no need to determine whether, despite the thoughts of the draftsmen, there might be some legal distinction between "vacate" and "close".

If there is no distinction between "vacate" and "close" the two statutes (section 7-14-4114 and 7-3-4448) overlap. Indeed, some overlap is inevitable because both sections contain the word "vacate." Further, the notice provision, section 7-14-4114(3), MCA, uses the word vacate:

"Before acting upon such petition a notice must be published or posted in three public places, stating when such petition will be acted on, and what street or alley, or part thereof, is asked to be vacated. Such notice must be published in a newspaper or posted at least one week before the petition is acted on." (Emphasis added.)

Thus, two separate statutes with separate, conflicting notice requirements purport to deal with the procedures for vacating a city street. We conclude, however, that the City closed, rather than vacated the street, and that the notice by publication was therefore adequate.

Section 7-3-4448, dealing with vacation and changing names of streets declares that vacation operates as a revocation of the city's acceptance of the dedicated street or alleyway:

. . . and such order of the commission vacating or narrowing a street or alley, which has been dedicated to public use by the proprietor, shall, to the extent that it is vacated or narrowed, operate as a revocation of the acceptance thereof by the commission,. . ." (Emphasis added.)

-12-

It is plain that the City in this case did not intend to revoke its acceptance of two blocks of 20th Street South, but rather to alter its use by closing it to through traffic. It has not given up its interest in the street. The City therefore had the power to enact the closure resolution once it had followed the requirements of sections 7-14-4115 and 7-14-4114(3), MCA. Had the City intended to revoke its acceptance of the street, to give it up, to vacate its legal interest in the street, it would have been necessary to follow the personal notice requirements of section 7-3-4448. Since, however, the City only closed the street to through traffic, the notice by publication was sufficient.

Plaintiffs contend that the City's closure of the streets and alleys bordering their lots is void because of the City's failure to preserve an easement of way through the closed portions of roadway. The right-of-way requirement is included in the final clause of section 7-3-4448:

". . . the right of way and easement therein of any lot owner shall not be impaired thereby."

Thus, when a city vacates a street or alley, the abutting owners right of access through the vacated street must not be impaired. Once again the conflict between section 7-14-4115 and section 7-3-4448, MCA, comes into view. Section 7-14-4115, which governs "closing" and "vacation" contains no similar requirement.

As we have determined above, the City did not "vacate" the streets and alleys in the sense of revoking its acceptance of them under section 7-3-4448, MCA. Under section 7-14-4115, the City had the power to close the street and alter its use without any need of preserving easements. Since there was no "vacation" in the sense of section 7-3-4448, MCA, neither must there be a preservation of easements in conformity with that section.

-13-

Having concluded that the City properly "closed" the street and alley which adjoined the plaintiffs' lots we must determine what, if any interest, passes to the plaintiffs in those closed sections of street and alley. The plaintiffs contend that the City has vacated the street and alley and that they are therefore entitled to the half of the street and alley nearest their lot under a common-law reversion. Because we have already concluded that there is a difference between "closure" and "vacation" and that the City only closed, rather than vacated the street and alley, we must reject this contention. The City did not revoke its acceptance of the dedicated land, but has limited and altered its use for school purposes. Thus there can be no reversion to the adjoining landowner. The City has given up nothing.

Assuming the City has power to create a cul-de-sac of one of the streets abutting the plaintiffs' lots, the plaintiffs further argue that such an action by the City causes compensable damage to their property. The question created by this contention is whether the plaintiffs have a property interest, unique from that of the public in general, in access to their lot from the nearest intersection in both directions.

It is clear that a lot owner whose lot abuts upon a public roadway has some rights of easement that are distinct from those of the general public. It is the extent of the rights of the abutting lot owner which distinguishes the majority from the minority position.

Perhaps a majority of courts have concluded that this right of access extends from the property owner's lot to the next adjoining intersections in both directions along the public street. Bacich v. Board of Control of California (1943), 23 Cal.2d 343, 349-350, 144 P.2d 818, 823. Annot. 49 A.L.R. 330, 351 (1927), and 93 A.L.R. 639, 642 (1934). In Bacich, the California Supreme

-14-

Court created an easement in both directions in favor of the abutting lot owner. Having created the easement, it was a simple step to hold that cutting off half of the easement by allowing traffic in only one direction, the easement has been impaired and a right to damages is created. 23 Cal.2d at 354, 144 P.2d at 825.

On the other hand, a minority position, perhaps best articulated by Justice Traynor in the Bacich dissent, agrees that there exists some right of access unique to the landowner whose lot abuts a public street, but denies that such a private right extends in both directions to the nearest intersection. Obviously, if no easement exists in both directions, the property owner "can have no recovery even though the value of the abutting property may be diminished as a result of the improvement." 23 Cal.2d at 369, 144 P.2d at 833, citations omitted (Traynor, J. dissenting).

In his dissent, Justice Traynor observed that the right of ingress and egress is a creation of judicial decision which has protected lot owners from particular types of street improvements which would impair the use of their land. Nonetheless, the abutting owners' rights were always considered subordinate to "any reasonable use of the street made by public authorities to facilitate general travel." 23 Cal.2d at 370-371, 144 P.2d at 833-834. Thus, so long as some "adequate and reasonable" means of access is preserved, an abutting landowner suffers no compensable injury from the closure of traffic from one direction:

> "The trust that arises from the appropriation
> of land for public thoroughfares is for the
> benefit of the public at large and only
> incidentally for the benefit of abutting owners.
> The extension of the abutting owner's rights in
> the present case makes the primary consideration
> the benefit of abutting owners rather than the
> benefit of the public. Hitherto no California
> case has ever defined the right of ingress or
> egress as inclusive of an easement to the next

-15-

intersecting street.  The rule has been that the
right of ingress and egress is limited to adequate
and reasonable access to the property from the
street, that it does not extend to the full width
of the street, or to the full length thereof, or
even to all points upon the street in front of
the abutting property.  It is sufficient if there
is access to a street that in turn connects with
the general street system.  Any improvement that
does not materially interfere with such access
does no compensable damage."  23 Cal.2d at 371, 144
P.2d at 834.   (Traynor, J. dissenting.)

Public policy is better served by the minority position.
Reasonable regulation of traffic often impairs total freedom
of access by abutting lot owners.  If a municipality were
forced to compensate abutting owners each time it limited their
two-directional access, the municipalities' incentive or ability
to provide for the safe flow of traffic would be restricted.
There are several instances, for example, in which a city may
reregulate traffic without compensation to abutting owners:

".  .  . city traffic ordinances abound with
regulations that limit a property owner's freedom
of movement upon the street on which his property
abuts.  Thus 'U' turns or the making of left turns
upon emerging from a building or private driveway
are frequently prohibited, and the diversion of
traffic into one-way streets is common.  Frequently
traffic moving in opposite directions is separated
by some physical barrier such as a raised curbing.
These restrictions have the same effect whether
they ensue from traffic regulations or physical
obstructions and there is no more reason to allow
compensation because of the resulting diminution in
property values or the inconvenience of circuity of
travel in the one case than in the other."  Bacich,
23 Cal.2d at 371-372, 144 P.2d at 834-835.

In the present case, the closure was effected for the
purpose of protecting pedestrian school children on their way
to and from school, and to prevent automobile noises from
disrupting classes on the east side of the school building.
These purposes would be discouraged if a city were forced to
compensate the abutting land owners for their loss of two-way
access.  Here, reasonable access of the plaintiffs to their
property has been preserved.

-16-

The minority position is not only more legally sound, but more realistically serves the needs of a community.

The judgment of the District Court is affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices